No. 73,039

In the Matter of the Care and Treatment of LEROY HENDRICKS,
*Appellant.*
(912 P.2d 129)

Opinion filed March 1, 1996.

*Thomas J. Weilert*, of Wichita, argued the cause, and *E.J. Greeno*, of Greeno & Boohar, of Wichita, and *Laura B. Shaneyfelt*, of Focht, Hughey & Calvert, of Wichita, were with him on the brief for appellant.

*David Lowden*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla Stovall*, attorney general, were with him on the brief for appellee.

*Andrew L. Warren*, of Overland Park, was on the brief for *amicus curiae* American Civil Liberties Union.

*David Gottlieb*, of Lawrence, *Jessica R. Kunen*, chief appellate defender, *Rebecca E. Woodman*, assistant appellate defender, and *Elizabeth Seale Cateforis*, assistant appellate defender, were on the brief for *amici curiae* Kansas Defender Project/Appellate Defender Office.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Leroy Hendricks appeals from a jury finding that he is a sexually violent predator as defined in the Sexually Violent Predator Act (the Act), K.S.A. 59-29a01 *et seq.*, and from the district court's order of commitment, which was issued pursuant to that finding. The Act establishes a procedure, which is stated to be civil, for involuntarily committing sexually violent predators for long-term care and treatment. Hendricks challenges the constitutionality of the Act and also raises various other grounds for reversing the finding and order of the district court. The case was transferred to this court from the Court of Appeals pursuant to K.S.A. 20-3018(c).

This case was initiated by the district attorney's filing on August 17, 1994, of a petition in the district court seeking commitment of Leroy Hendricks as a sexually violent predator under the Act. The petition recited that it anticipated Hendricks' release from confinement on September 11, 1994, and stated the following criminal history:

"That on the 26th day of November, 1984 respondent Leroy V. Hendricks was convicted in the Eighteenth Judicial District, District Court, Sedgwick County, Kansas, Case No. **84CR1463** of a sexually violent offenses [*sic*] involving two victims as defined by law, to wit: **K.S.A. 21-3503 Indecent Liberties with a Child; and K.S.A. 21-3503 Indecent Liberties with a Child; and has a history of prior sexual offenses from other jurisdictions, to wit: 1960 Spokane, Washington, Indecent Liberties with a Child; Seattle, Washington (1963 and 1967) Indecent Liberties with a Child (two separate cases).**"

The petition further alleged that Hendricks "suffers from a mental abnormality or personality disorder which makes him likely to engage in predatory acts of sexual violence."

At the time the petition was filed, Hendricks was serving a sentence of 5 to 20 years' imprisonment. The sentence had been imposed in accordance with the State's recommendation pursuant to a plea agreement. Under the agreement, Hendricks pled guilty in November 1984 to two counts of indecent liberties with a child. The State dismissed a third count of indecent liberties and refrained from requesting imposition of the Habitual Criminal Act.

On August 19, 1994, Hendricks appeared with counsel in district court. At the beginning of the hearing, Hendricks presented a motion to dismiss the petition. Counsel argued the following grounds for dismissal: insufficient factual allegations, failure to serve Hendricks with the petition, unconstitutionality of the Act, and breach of the plea agreement. The district court allowed the State to present evidence. In a journal entry filed on August 23, 1994, the district court found no fatal flaws in the petition or its service and reserved ruling on the constitutionality of the Act and the argument that the State was estopped by virtue of the plea agreement. The district court concluded that there was probable cause to believe that Hendricks is a sexually violent predator as defined in the Act and that he should be evaluated at Larned State Security Hospital to determine if he is.

Upon advice of counsel, Hendricks did not participate in the evaluation at the state hospital. As a result, the first report issued by the hospital was based on available records and behavioral observations during his stay. After ruling that the nature of the Act is civil rather than criminal or quasi-criminal so that the privilege against self-incrimination does not apply, the district court granted the State's request for an order compelling discovery. The district court ordered another evaluation and ordered Hendricks to cooperate in it.

A jury trial was conducted October 3-5, 1994. Hendricks was called as a witness by the State. He testified that he was 60 years old, that his history of sexual involvement with children began with his exposing himself to two girls in 1955, and that he had spent approximately half the time since then in prison or in psychiatric institutions. He explained that when he gets "stressed out," he is unable to control the urge to engage in sexual activity with a child. Hendricks agreed that he is a pedophile and that he is not cured of the condition.

The State also called Charles Befort, the chief psychologist at Larned State Hospital. He testified that a personality disorder consists of traits or characteristics which tend to produce in most situations predictable but unacceptable or abnormal behavior. He testified that a pedophile is predisposed to commit sexual acts with

children and that pedophilia in and of itself is not considered to be a personality disorder. Dr. Befort testified that during the previous week he had performed an evaluation of Hendricks. Dr. Befort believed it likely that Hendricks would engage in predatory acts of sexual violence or sexual activity with children if permitted to do so. The factors upon which he based this opinion were the aphorism that "behavior is a good predictor of future behavior," his professional knowledge that pedophiles tend to repeat their behavior, and Hendricks' poor understanding of his behavior. He testified that he did not believe Hendricks was mentally ill or had a personality disorder but that, as he interpreted the Act, pedophilia was a mental abnormality. He agreed that his interpretation of the statute was open to debate.

William Logan, a forensic psychiatrist, testified on behalf of Hendricks. He testified about re-offense rates for sex offenders, as shown by various studies. Re-offense rates for persons who had received treatment ranged from 3 to 37½ percent; for untreated persons the range was 10 to 40 percent. Dr. Logan expressed the opinion that, based on current knowledge, "a psychiatrist or psychologist cannot predict whether an individual is more likely than not to engage in a future act of sexual predation."

The jury found that Hendricks is a sexually violent predator. He was committed to the custody of the Secretary of Social and Rehabilitation Services (SRS). Hendricks filed a motion to dismiss or, in the alternative, for a new trial which was based in part on evidence that apart from the regular staff of Larned State Hospital, professionals specifically dedicated to a treatment program for sexually violent predators were not available at the hospital. Although it had negotiated with two bidders who proposed to provide care and treatment under the Act, as of October 20, 1994, SRS had not entered into a contract with either. The motion was denied, and the district court ordered that Hendricks be transported to Larned State Security Hospital.

The Act is a product of the 1994 legislative session. It is patterned on a very similar statutory scheme enacted in the state of Washington in 1990. Wash. Rev. Code § 71.09.010 *et seq.* (1992). A divided Washington Supreme Court held that that state's act was

constitutional in *Personal Restraint of Young*, 122 Wash. 2d 1, 857 P.2d 989 (1993). Thereafter, the United States District Court for the Western District of Washington disagreed with the Washington Supreme Court and granted Young's petition for writ of habeas corpus. *Young v. Weston*, 898 F. Supp. 744 (W.D. Wash. 1995). The district court concluded that the Washington act "violates the substantive due process component of the Fourteenth Amendment, the Ex Post Facto Clause, and the Double Jeopardy Clause." *Young*, 898 F. Supp. at 754. We will revisit these cases later in this opinion.

The legislature's stated reasons for enacting a comprehensive scheme for commitment of sexually violent predators appear in K.S.A. 59-29a01:

"The legislature finds that a small but extremely dangerous group of sexually violent predators exist who do not have a mental disease or defect that renders them appropriate for involuntary treatment pursuant to the treatment act for mentally ill persons defined in K.S.A. 59-2901 et seq. and amendments thereto, which is intended to provide short-term treatment to individuals with serious mental disorders and then return them to the community. In contrast to persons appropriate for civil commitment under K.S.A. 59-2901 et seq. and amendments thereto, sexually violent predators generally have antisocial personality features which are unamenable to existing mental illness treatment modalities and those features render them likely to engage in sexually violent behavior. The legislature further finds that sexually violent predators' likelihood of engaging in repeat acts of predatory sexual violence is high. The existing involuntary commitment procedure pursuant to the treatment act for mentally ill persons defined in K.S.A. 59-2901 et seq. and amendments thereto is inadequate to address the risk these sexually violent predators pose to society. The legislature further finds that the prognosis for rehabilitating sexually violent predators in a prison setting is poor, the treatment needs of this population are very long term and the treatment modalities for this population are very different [from] the traditional treatment modalities for people appropriate for commitment under the treatment act for mentally ill persons defined in K.S.A. 59-2901 et seq. and amendments thereto, therefore a civil commitment procedure for the long-term care and treatment of the sexually violent predator is found to be necessary by the legislature."

This section is virtually identical to Wash. Rev. Code § 71.09.010 (1992).

In K.S.A. 59-29a02, terms are defined as they are used in the Act. The following are relevant to our determination:

"(a) 'Sexually violent predator' means any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence.

"(b) 'Mental abnormality' means a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others.

. . . .

"(e) 'Sexually violent offense' means:

. . . .

(2) indecent liberties with a child as defined in K.S.A. 21-3503 and amendments thereto."

The legislature apparently anticipated that the principal use of the commitment procedure would follow incarceration. K.S.A. 59-29a03 provides that 60 days before the anticipated release of a person who may meet the criteria of a sexually violent predator, the agency with authority over the release must notify the prosecutor in the county where the person was charged. K.S.A. 59-29a04 prescribes initiation of the commitment procedure:

"When it appears that the person presently confined may be a sexually violent predator, the prosecuting attorney of the county where the person was convicted or charged or the attorney general if requested by the prosecuting attorney may file a petition, within 45 days of the date the prosecuting attorney received the written notice . . . alleging that the person is a sexually violent predator and stating sufficient facts to support such allegation."

In the next step, a judge determines whether probable cause exists to believe that the person named in the petition is a sexually violent predator. If so, the person is transferred to an appropriate facility for a professional evaluation. K.S.A. 59-29a05.

K.S.A. 59-29a06 provides that "[w]ithin 45 days after the filing of a petition . . . the court shall conduct a trial to determine whether the person is a sexually violent predator." It further provides that the person is entitled to counsel and professionals "to perform an examination [on] such person's behalf." Last, it provides that trial will be to the court in the absence of a jury demand, but that a written jury demand filed at least 4 days before trial by petitioner, respondent, or the judge will be honored. K.S.A. 59-

29a07(a) provides that a determination that the person is a sexually violent predator must be made "beyond a reasonable doubt" or the person must be released. Where the court or jury is satisfied beyond a reasonable doubt that the person is a sexually violent predator,

"the person shall be committed to the custody of the secretary of social and rehabilitation services for control, care and treatment until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large. Such control, care and treatment shall be provided at a facility operated by the department of social and rehabilitation services." K.S.A. 59-29a07(a).

K.S.A. 59-29a08 requires an annual "examination of the person's mental condition" and an annual court review of the status of the committed person for the purpose of determining whether "probable cause exists to believe that the person's mental abnormality or personality disorder has so changed that the person is safe to be at large and will not engage in acts of sexual violence if discharged." If so, the court will schedule a hearing at which the burden of proof "shall be upon the state to prove beyond a reasonable doubt that the committed person's mental abnormality or personality disorder remains such that the person is not safe to be at large and if released is likely to engage in acts of sexual violence."

Another means of release is set out in K.S.A. 59-29a10:

"If the secretary of the department of social and rehabilitation services determines that the person's mental abnormality or personality disorder has so changed that the person is not likely to commit predatory acts of sexual violence if released, the secretary shall authorize the person to petition the court for release. . . . The hearing shall be before a jury if demanded by either the petitioner or the county or district attorney or attorney general."

The burden of proof is the same as it would be at a hearing on an annual review. K.S.A. 59-29a10. The committed person may file a petition seeking release at any time, but broad restrictions apply to petitioning for discharge without approval of the Secretary of SRS and make release through this avenue seem improbable. See K.S.A. 59-29a11.

K.S.A. 59-29a13 provides that "prior to the release of a person committed under this act, the secretary of the department of social

and rehabilitation services shall give written notice of such release to any victim of the person's activities or crime."

Hendricks challenges the constitutionality of the Act on various grounds, alleging the Act violates both the United States and Kansas Constitutions. He argues the Act violates the prohibition against double jeopardy and ex post facto laws, fails to provide equal protection and procedural or substantive due process, and is void as overly broad and vague.

We first consider Hendricks' substantive due process challenge. In so doing, we must presume the Act is constitutional and resolve all doubts in favor of the Act's validity. If there is any reasonable way to construe the Act as constitutionally valid, we must do so. The Act must clearly violate the Constitution before it may be struck down. See *Sedlak v. Dick*, 256 Kan. 779, 793, 887 P.2d 1119 (1995); *Chiles v. State*, 254 Kan. 888, 897, 869 P.2d 707, *cert. denied* 130 L. Ed. 2d 88 (1994); *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, 243, 834 P.2d 368 (1992). The burden of proof is on the party challenging the constitutionality of the Act.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits a State's depriving any person of liberty "without due process of law." It "contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.' " *Zinermon v. Burch*, 494 U.S. 113, 125, 108 L. Ed. 2d 100, 110 S. Ct. 975 (1990).

Hendricks contends that his substantive due process liberty interest is violated by indefinite confinement under K.S.A. 59-29a01 *et seq.* He relies on *Foucha v. Louisiana*, 504 U.S. 71, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992). He represents the case as holding that due process prohibits a person's being involuntarily committed by a civil proceeding absent a finding that the person is both mentally ill and dangerous. It is his contention that the Act's requirement of a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence falls short of a finding of mental illness. He points out that "[t]he express purpose of the statutory scheme . . . is to confine persons 'who do not have a mental disease or defect that renders them appro-

priate for involuntary treatment pursuant to the treatment act for mentally ill persons . . . .' K.S.A. 59-29a01."

As a criminal defendant charged with aggravated burglary and illegal discharge of a firearm, Foucha, in 1984, had been found by a Louisiana trial court not guilty by reason of insanity. Under Louisiana law he was committed to a psychiatric hospital, whether or not he was then insane, absent proof that he was not dangerous. Release under the Louisiana law depended on proof by Foucha that he was not dangerous. In the United States Supreme Court it was Foucha's contention "that this scheme denies him due process and equal protection because it allows a person acquitted by reason of insanity to be committed to a mental institution until he is able to demonstrate that he is not dangerous to himself and others, even though he does not suffer from any mental illness." 504 U.S. at 73.

In 1988, the superintendent of the facility in which Foucha was confined recommended that he be discharged or released. A three-member panel recommended that he be conditionally discharged. The two doctors appointed by the trial judge as a "sanity commission" agreed that Foucha's psychosis probably had been drug-induced, that he had recovered from that temporary condition, and that he showed no signs of psychosis or neurosis, but that he has "an antisocial personality, a condition that is not a mental disease and that is untreatable." 504 U.S. at 74. Thus, the doctors declined to certify that Foucha would not be a danger to himself or others. His confinement, therefore, was continued.

The Supreme Court's analysis began with *Addington v. Texas*, 441 U.S. 418, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979), in which it was

"held that to commit an individual to a mental institution in a civil proceeding, the State is required by the Due Process Clause to prove by clear and convincing evidence the two statutory preconditions to commitment: that the person sought to be committed is mentally ill and that he requires hospitalization for his own welfare and protection of others." *Foucha*, 504 U.S. at 75-76.

A person who has been found not guilty of a criminal offense by reason of insanity, however, may be committed by a State "without satisfying the *Addington* burden with respect to mental illness and dangerousness." 504 U.S. at 76, citing *Jones v. United States*, 463

U.S. 354, 363, 77 L. Ed. 2d 694, 103 S. Ct. 3043 (1983), where the Supreme Court reasoned that guilt by reason of insanity established that (1) because of mental illness, (2) the defendant committed an act which constituted a criminal offense. Therefore, the *Foucha* Court held, it "could be properly inferred that at the time of the verdict, the defendant was still mentally ill and dangerous and hence could be committed." 504 U.S. at 76. Under the Constitution, confinement could continue until the person regained his sanity or no longer presented a danger to himself or others. See 504 U.S. at 77-78; *Jones*, 463 U.S. at 368.

Foucha had regained his sanity; the basis for confining him as a defendant who was not guilty by reason of insanity no longer existed. The State perpetuated his confinement on the basis of his potentially being dangerous due to his antisocial personality. The Supreme Court concluded that Foucha's liberty interest in being freed from indefinite confinement in a mental facility could not be defeated on that basis.

In distinguishing *United States v. Salerno*, 481 U.S. 739, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987), the Supreme Court emphasized the strict limitations of pretrial detention of persons who pose a danger. *Foucha*, 504 U.S. at 82. In this context the Court stated:

"Here, in contrast, the State asserts that because Foucha once committed a criminal act and now has an antisocial personality that sometimes leads to aggressive conduct, a disorder for which there is no effective treatment, he may be held indefinitely. This rationale would permit the State to hold indefinitely any other insanity acquittee not mentally ill who could be shown to have a personality disorder that may lead to criminal conduct. *The same would be true of any convicted criminal, even though he has completed his prison term.* It would also be only a step away from substituting confinements for dangerousness for our present system which, with only narrow exceptions and aside from permissible confinements for mental illness, incarcerates only those who are proved beyond reasonable doubt to have violated a criminal law." (Emphasis added.) 504 U.S. at 82-83.

The Washington Supreme Court found that Washington's sexual predator statute conformed to the due process standard of *Addington* and *Foucha*—clear and convincing proof of mental illness and dangerousness. *Personal Restraint of Young*, 122 Wash. 2d 1, 27, 857 P.2d 989 (1993). The requirement that commitment be predicated on dangerousness is said to be satisfied under the def-

inition of sexually violent predator. Wash. Rev. Code § 71.09.020(1) (1992) defines a sexually violent predator as a person "likely to engage in predatory acts of sexual violence."

With regard to the requirement of mental illness, the court reasoned that the terms "mental abnormality," "mental disorder," and "mental illness" "are largely synonymous." 122 Wash. 2d at 27 n.3. Thus, the reasoning continues, by defining a sexually violent predator as a person who suffers from a mental abnormality or personality disorder, the requirement is satisfied. At the heart of the court's reasoning is a selective and inconsistent use of the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (3d ed. rev. 1987) (hereafter cited as DSM-III-R). On the one hand, the court reasons that because "anti-social personality disorder" is defined in the DSM-III-R, it is a mental disorder, 122 Wash. 2d at 30, and on the other hand, that "mental abnormality" is a mental disorder, notwithstanding that it is not defined as such in the DSM-III-R. Simply stated, mental illness means whatever the Washington court says it means; it is this reasoning which was the basis for the court's conclusion that the Washington act did not conflict with *Foucha.*

The apparent inconsistency with Foucha's having an antisocial personality *rather than* being mentally ill was at first glossed over by the Washington majority, which noted that Young suffered from an antisocial personality disorder, which "is classified as a mental disorder in the *DSM-III-R.*" 122 Wash. 2d at 30. In a subsequent footnote, the majority offered the following justification:

"Petitioners raise the issue that, under *Foucha,* it is impermissible to civilly commit someone who has an 'antisocial personality,' because that condition is not a mental disorder. According to petitioners, the sex predator Statute violates this holding. This argument belies a careless reading of the *Foucha* facts. First, the condition in *Foucha* was an 'antisocial personality.' This condition falls within the *DSM-III-R* section entitled 'V Codes for Conditions Not Attributable to a Mental Disorder' and is formally designated 'antisocial behavior'; it is not a mental disorder. As such, anti-social behavior cannot form the basis for civil commitment. *Foucha v. Louisiana* (112 S. Ct. 1780). The sex predator Statute, however, requires proof of a 'personality *disorder*' as one of the alternative means of commitment. (Italics ours.) RCW 71.09.020. Unlike 'antisocial behavior,' an 'antisocial

personality disorder' is a recognized mental disorder which is defined in the *DSM-III-R*, at 342." *Young*, 122 Wash. 2d at 37 n.12.

The Washington court's dissenters disputed this rationale. Their precept was that "the Statute . . . fails to meet the mental illness requirement." 122 Wash. 2d at 61. Thus, "[l]ike the statute in *Foucha*, [the Washington statute] violates substantive due process because it requires only dangerousness and not mental illness as a prerequisite to commitment." 122 Wash. 2d at 63. It was suggested in the dissenting opinion that the majority indulged in "psychiatric incantations." 122 Wash. 2d at 65. The dissenting justices warned that "by authorizing the indefinite confinement in mental facilities of persons who are not mentally ill, the Statute threatens not only the liberty of certain sex offenders, but the liberty of us all." 122 Wash. 2d at 60. The dissenting justices recognized the insidious effect of sanctioning the separation of the commitment of sexually violent predators from the statutory procedure for the commitment of the mentally ill. Once that is accomplished, the same reasoning could be applied to anyone who commits any designated offense and is labeled "mentally abnormal" or suffering from an "anti-social personality disorder."

*Foucha* also was a focus for the federal district court in *Young*, which agreed with the dissenting Washington justices that there is no mental illness requirement in the statute. 898 F. Supp. at 749. The district court noted:

"The absence of a mental illness requirement is apparent both in the statutory language and in its legislative history. First, the legislature's findings expressly disavow the notion that the targeted group of persons are mentally ill. As explained in Wash. Rev. Code § 71.09.010, the target group is made up of individuals 'who do not have a mental disease or defect that renders them appropriate for the existing involuntary treatment act.' Unlike persons with serious mental disorders, the legislature concluded, sexual predators 'have antisocial personality features which are unamenable to existing mental illness treatment modalities,' and for which the prognosis of cure is poor." 898 F. Supp. at 749.

After examining the statutory language and legislative history, the district court concluded

"that the Sexually Violent Predator Statute, allowing as it does the indefinite confinement of persons who are not mentally ill, violates the substantive protections

of the Due Process Clause. Predictions of dangerousness alone are an insufficient basis to continue indefinitely the incarceration of offenders who have completed their prison terms." 898 F. Supp. at 751.

It is clear that the overriding concern of the legislature is to continue the segregation of sexually violent offenders from the public. Treatment with the goal of reintegrating them into society is incidental, at best. The record reflects that treatment for sexually violent predators is all but nonexistent. The legislature concedes that sexually violent predators are not amenable to treatment under K.S.A. 59-2901 *et seq.* If there is nothing to treat under 59-2901, then there is no mental illness. In that light, the provisions of the Act for treatment appear somewhat disingenuous. The federal district court in *Young* observed:

"The Statute forecloses the possibility that offenders will be evaluated and treated until after they have been punished. Of course, it defies reason to suggest that the mental abnormalities or personality disorders causing violent sexual predation surface only at the termination of a prison term. Common sense suggests that such mental conditions, if they are indeed the cause of sexual violence, are present at the time the offense is committed. Setting aside the question of whether a prison term exacerbates or minimizes the mental condition of a sex offender, it plainly delays the treatment that must constitutionally accompany commitment pursuant to the Statute. The failure of the Statute to provide for examination or treatment prior to the completion of the punishment phase strongly suggests that treatment is of secondary, rather than primary, concern." 898 F. Supp. at 753.

It is clear that the primary objective of the Act is to continue incarceration and not to provide treatment. Protecting the public is a legitimate exercise of the State's police power. Although the Act is a well-intentioned attempt by the legislature to accomplish that objective, it cannot be done in a constitutionally impermissible manner. Having said that, we need to point out that the legislature has provided the State with other options to achieve that objective and, in addition, has the authority to increase the penalty for sex crimes committed against children.

The record indicates that Hendricks had at least three felony convictions prior to being charged in the present case. Under the Habitual Criminal Act, Hendricks' sentence could have been tripled. Also, Hendricks could have been sentenced to the maximum rather than the minimum sentence. Additionally, the sentences

could have been ordered to run consecutively rather than concurrently. The State chose not to pursue any of these options. Instead, the State opted to enter into a plea bargain with Hendricks. The State agreed to dismiss one count, to recommend the statutory minimum sentence of 5 to 20 years, and to not seek imposition of the Habitual Criminal Act.

The State now chooses to pursue the option under the Act to continue Hendricks' incarceration. The State contends that commitment under the Act requires "a finding of mental illness and dangerousness . . . consistent with *Foucha*." The only authority cited by the State is a passage from *Young* in which the Washington Supreme Court addresses only the element of dangerousness, never mentioning mental illness.

We find no support in the Act that a finding of mental illness is required. As noted by the federal district court in *Young*, there is an absence of a mental illness requirement in the language of the Washington act. K.S.A. 59-29a01 states that sexually violent predators do not have a mental illness which "renders them appropriate for involuntary treatment pursuant to the treatment act for mentally ill person defined in K.S.A. 59-2901 et seq." The statute then contrasts sexually violent predators with "persons appropriate for civil commitment under K.S.A. 59-2901 et seq." in that they have "antisocial personality features which are unamenable to existing mental illness treatment modalities." By such language, the legislature recognizes that sexually violent predators are not mentally ill but, rather, have an "antisocial personality feature" or a "mental abnormality."

Hendricks takes the position that, on the record in this case, the reasoning employed by the Washington court in upholding the constitutionality of its statute has no support. In other words, the record in this case will not support a finding that the statutory requirement of a mental abnormality or a personality disorder is equivalent to the constitutional standard of mental illness. We agree.

The State's principal evidence concerning Hendricks' mental state was the testimony of Charles Befort, the chief psychologist at Larned State Security Hospital. He testified that he did not believe

Hendricks was mentally ill or had a personality disorder. Dr. Befort described a person with a personality disorder as

"an individual who has a set of characteristics or traits that are enduring; that is, traits or characteristics that tend to result in their behaving in fairly standard predictable ways through most situations. Now, we all have those things, those traits and characteristics. It becomes a disorder when those traits and characteristics result in the person behaving or thinking, perhaps, or otherwise acting in such a way that it causes them trouble, causes society trouble, is considered abnormal, then it becomes a disorder."

Dr. Befort testified that an example of a personality disorder is antisocial personality. He described persons with antisocial personalities as

"individuals who have disregard for social expectations, social values, social norms. Their behavior indicates that disrespect or unconcern about staying within acceptable boundaries of behavior. Usually these behaviors include disregard for others' rights. They may exploit other people to those persons' detriment. In the worst cases, of course, they turn to crime, criminal behavior. In non-criminal things, they tend to be untrustworthy. They're egocentric, those types of things."

He testified that pedophilia is not considered a personality disorder, but is considered a mental abnormality. As already noted, in Dr. Befort's opinion, Hendricks does not have a personality disorder. Personality disorder is not defined in the Act.

With regard to the term "mental abnormality," Dr. Befort said that it is a phrase used by clinicians to discuss abnormality or deviance, but that it is not a diagnosis. The term is not defined in DSM-III-R. It therefore could not be used appropriately in a formal diagnosis. "Mental abnormality" is not a psychiatric or medical term but, rather, a legal term defined in the Act. K.S.A. 59-29a02(b) provides: " 'Mental abnormality' means a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." Dr. Befort testified that this definition is circular in that certain behavior defines the condition which is used to predict the behavior. In a similar regard, the federal district court in *Young* stated that in the Washington statute's use of "personality

disorder," "the only observed characteristic of the disorder is the predisposition to commit sex crimes." 898 F. Supp. at 750.

We must determine if Hendricks is denied substantive due process based not on his lack of character but, rather, on the merits of his challenge. Mental illness is defined in K.S.A. 59-2902(h) as meaning any person who: "(1) [i]s suffering from a severe mental disorder to the extent that such person is in need of treatment; (2) lacks capacity to make an informed decision concerning treatment; and (3) is likely to cause harm to self or others." Here, neither the language of the Act nor the State's evidence supports a finding that "mental abnormality or personality disorder," as used in 59-29a02(a), is a "mental illness" as defined in 59-2902(h). Absent such a finding, the Act does not satisfy the constitutional standard set out in *Addington* and *Foucha*. Justice White, speaking for the majority of the United States Supreme Court in *Foucha*, clearly stated that to indefinitely confine as dangerous one who has a personality disorder or antisocial personality but is not mentally ill is constitutionally impermissible. 504 U.S. at 78. Similarly, to indefinitely confine as dangerous one who has a mental abnormality is constitutionally impermissible.

In addition, the State's own evidence is that Hendricks was being committed even though he does not suffer from mental illness. Hendricks is not mentally ill, and the criminal offenses for which he was imprisoned were not the result of mental illness. Therefore, as applied to Hendricks, the constitutionality of the Act depends upon a showing of dangerousness without a finding of mental illness. Clearly, the due process standard of *Addington* and *Foucha* is not met by the Act as applied to Hendricks. We conclude that the Act violates Hendricks' substantive due process rights.

We hold that the Kansas Sexually Violent Predator Act, K.S.A. 59-29a01 *et seq.*, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Having so held, we need not consider the other issues raised by Hendricks in this appeal. We note that the dissenters have chosen to consider and decide those issues, notwithstanding that they have not been addressed or decided by the majority. That part of the dissent is dicta and for that reason does not warrant a response.

The judgment of the district court is reversed.

LOCKETT, J., concurring: This case illustrates better than most that the process of judicial decision is often difficult to exercise. The hard fact is that sometimes we make decisions we do not like. We make them because they are right, right in the sense that the law and the Constitution as we see them compels the result.

Our colleagues in dissent advance powerful public policy arguments as to why the Kansas Sexually Violent Predators Act (Act) should be found not to violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. With all due respect to those views, I do not believe that the Constitution gives us the right to rule as the dissenting members of the court urge. In this concurring opinion, I will set out my reasoning for joining Justice Allegrucci's majority opinion.

The dissent disagrees with the basic premise, the underlying reasoning, and the decision of the majority that the Act violates the due process clause of the Fourteenth Amendment to the United States Constitution. The dissent bases its reasoning on the decisions of the Supreme Courts of Washington and Wisconsin "which are almost identical and substantially similar legislation in their respective states." The dissent failed to note that a United States District Court disagreed with the decision of the Washington Supreme Court and declared the similar Washington sexual violent predator act an unconstitutional violation of the Due Process, Ex Post Facto, and Double Jeopardy Clauses of the federal Constitution when the same offender later petitioned the district court for a writ of habeas corpus. *Young v. Weston*, 898 F. Supp. 744 (D. Wash. 1995).

The United States Constitution is our primary governing document. The Constitution permits the State to remove criminals and the mentally ill from society. Criminals and the mentally ill have separate rights under the Constitution. Under the Constitution, criminals have the rights of equal protection and due process and cannot be cruelly or unusually punished or punished twice for the same crime. The mentally ill have the rights of equal protection and due process and cannot be punished for being mentally ill.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that before an individual may be involuntarily committed for control, care, and treatment, the State must prove by clear and convincing evidence that the individual is both mentally ill and dangerous. Under our statutory law a mentally ill person is any person who: (1) is suffering from a severe mental disorder to the extent that such person is in need of treatment; (2) lacks capacity to make an informed decision concerning treatment; and (3) is likely to cause harm to self or others. K.S.A. 59-2902(h). Individuals who are mentally ill may be civilly committed. The State is required to treat these individuals while committed and release them when the statute no longer applies.

A criminal may be sentenced to imprisonment because he or she broke the law and is a danger to others. Some individuals who commit crimes have a personality disorder termed antisocial. An antisocial person is an individual who has disregard for social expectations, social values, and social norms. The person's behavior indicates a disrespect or unconcern about staying within acceptable boundaries of behavior. Usually the behavior includes disregard for others' rights. The antisocial person may exploit another to that person's detriment. In the worst cases, the individual turns to crime.

Leroy Hendricks has an antisocial personality. He is not mentally ill and could not be committed for treatment to protect society. Hendricks committed sex crimes against children. He was sentenced and imprisoned for those crimes. Without violating the Constitution, the State could have incarcerated Hendricks until he exhaled his last breath and his spirit departed this earth, but it did not. Hendricks has now served the criminal sentence imposed by the State and under the law must now be released, even if he has an antisocial personality.

In an effort to protect society from individuals, such as Hendricks, who are antisocial and will in all probability commit other sex crimes when released from prison, the Act was enacted. The Act reclassifies persons to be mentally ill who are antisocial, a danger to others, and have been convicted of a specific sex crime. The effect is that the criminal is reclassified as a mentally ill person.

The Act permits the State to civilly commit the criminal for treatment as a mentally ill person because of a past criminal act and the fact that the individual has an antisocial personality.

The purpose of having a federal Constitution is to insure equal justice nationwide. In any action where there is a question regarding the United States Constitution, state courts have the power to determine whether the act or action violates the United States Constitution. State courts cannot disregard prior decisions of the United States Supreme Court which interpret the United States Constitution.

The United States Supreme Court in *Foucha v. Louisiana*, 504 U.S. 71, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992), noted that to commit an individual to a mental institution in a civil proceeding, the State is required by the Due Process Clause to prove by clear and convincing evidence the two statutory preconditions to commitment: The person sought to be committed is mentally ill, and the person requires hospitalization for his or her own welfare and the protection of others.

The State of Louisiana asserted that because an individual, like Hendricks here, once committed a criminal act and now has an antisocial personality which sometimes leads to aggressive conduct, a disorder for which there is no effective treatment, the individual may be held indefinitely as being mentally ill. The United States Supreme Court stated that rationale would permit the State to hold indefinitely any other insanity acquittee, not only the mentally ill, who could be shown to have a personality disorder which may lead to criminal conduct. It noted that the same would be true of any convicted criminal, even though the person has completed his or her prison term. The *Foucha* Court pointed out that it would also be only a step away from substituting confinements for dangerousness for our present system which, with only narrow exceptions and aside from permissible confinements for mental illness, incarcerates only those who are proved beyond reasonable doubt to have violated a criminal law. The Supreme Court held that a convicted criminal, such as Hendricks, may not be held as a mentally ill person because of criminal dangerousness.

Because the Washington act, which is almost identical and substantially similar legislation to the Kansas act, was declared unconstitutional by the federal court, and the reasoning of the majority follows the prior decisions of the Supreme Court of the United States, I must join the majority.

In this instance we may not be the court of last resort. Under the rules of the United States Supreme Court, the State may seek a writ of certiorari, and that Court has the power to make the final determination.

LARSON, J., dissenting: I disagree with the basic premise, the underlying reasoning, and the conclusion of the majority that the Kansas Sexually Violent Predator Act (the Act) K.S.A. 59-29a01 *et seq.* violates the substantive aspect of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Kansas should join the decisions of the Supreme Courts of Washington (*Personal Restraint of Young*, 122 Wash. 2d 1, 857 P.2d 989 [1993]) and Wisconsin (*State v. Post*, 197 Wis. 2d 279, 541 N.W. 115 [1995]; *State v. Carpenter*, 197 Wis. 2d 252, 541 N.W. 105 [1995]) in upholding the validity of almost identical and substantially similar legislation in their respective states.

I would affirm the jury's finding that Leroy Hendricks is a sexually violent predator requiring care and treatment by the Secretary of Social and Rehabilitation Services (SRS) of the State of Kansas. In my analysis, I will first consider the Act, more closely examine the evidence, set forth my specific disagreements with the majority holding, then briefly show why the multiple claims of invalidity of the Act should fail and the decision of the trial court should be affirmed.

*History and provisions of the Kansas Sexually Violent Predator Act, K.S.A. 59-29a01 et seq.*

The issues raised in this appeal require the interpretation of the Act. The interpretation of a statute is a question of law over which our review is unlimited. *State v. Donlay*, 253 Kan. 132, Syl. ¶ 1, 853 P.2d 680 (1993). We begin the process by reviewing the history and provisions of the Act.

The 1994 Kansas Legislature, in response to the urging of an Ad Hoc Sexual Offender Task Force given impetus by the parents of Stephanie Schmidt (see *State v. Gideon*, 257 Kan. 591, 894 P.2d 850 [1995]), proposed, debated, and passed S.B. 525. Senator Bob Vancrum, before the Senate Judiciary Committee on February 22, 1994, stated it was designed "to protect our communities from those offenders who pose the greatest danger to society by providing for treatment and commitment of sexually violent predators until they are no longer a danger."

Senator Vancrum further said: "The bill is narrowly tailored to focus on the smaller number of habitual sex offenders who, because of their psychological makeup, pose an immediate danger to the public as soon as they are released from prison."

The debate prior to the bill's passage was intensified by law enforcement officials' statements of frustration at knowing that a soon-to-be-released sexual offender was likely to victimize another woman or child, testimony of Special Assistant Attorney General (now Attorney General) Carla J. Stovall to the House Judiciary Committee, March 21, 1994; and the emotional statement of a grieving father, Gene Schmidt, to the House Judiciary Committee, March 21, 1994. The debate included the measured concerns of Kelly McCaffrey, a private citizen, to the same House Judiciary Committee on March 21, 1994, who stated:

"Inevitably, several terms and definitions used in SB 525 will be a source of great consternation for some opponents of the bill, particularly those on the field of psychiatry. Such terms include 'sexual violent predator,' 'mental abnormality,' and 'personality disorder.' The argument is that such terms are merely legal, with no clinically significant meaning and no recognized diagnostic use."

McCaffrey went on to state that " 'legal rules are a specialized form of language that must respond to the human experiences that gave rise to them in the first place. Yet, legal rules must also structure that response in a way that allows them to be applied consistently and reliably' " (quoting Rideout, *So What's in a Name? A Rhetorical Reading of Washington's Sexually Violent Predators Act*, 15 U. Puget Sound L. Rev. 781 [1992]).

The Act's first section, K.S.A. 59-29a01, clearly states the legislative findings:

"The legislature finds that a small but extremely dangerous group of sexually violent predators exist who do not have a mental disease or defect that renders them appropriate for involuntary treatment pursuant to the treatment act for mentally ill persons defined in K.S.A. 59-2901 et seq. and amendments thereto, which is intended to provide short-term treatment to individuals with serious mental disorders and then return them to the community. In contrast to persons appropriate for civil commitment under K.S.A. 59-2901 et seq. and amendments thereto, sexually violent predators generally have antisocial personality features which are unamenable to existing mental illness treatment modalities and those features render them likely to engage in sexually violent behavior. The legislature further finds that sexually violent predators' likelihood of engaging in repeat acts of predatory sexual violence is high. The existing involuntary commitment procedure pursuant to the treatment act for mentally ill persons defined in K.S.A. 59-2901 et seq. and amendments thereto is inadequate to address the risk these sexually violent predators pose to society. The legislature further finds that the prognosis for rehabilitating sexually violent predators in a prison setting is poor, the treatment needs of this population are very long term and the treatment modalities for this population are very different than the traditional treatment modalities for people appropriate for commitment under the treatment act for mentally ill persons defined in K.S.A. 59-2901 et seq. and amendments thereto, therefore a civil commitment procedure for the long-term care and treatment of the sexually violent predator is found to be necessary by the legislature."

With it apparent that the legislature intended the commitment to be civil, the Act provides the following definitions:

"(a) 'Sexually violent predator' means any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person more likely to engage in the predatory acts of sexual violence.

"(b) 'Mental abnormality' means a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others.

"(c) 'Predatory' means acts directed towards strangers or individuals with whom relationships have been established or promoted for the primary purpose of victimization.

"(d) 'Sexually motivated' means that one of the purposes for which the defendant committed the crime was for the purpose of the defendant's sexual gratification." K.S.A. 59-29a02.

From the definitions, it is clear that before there can be a finding that a person is a sexually violent predator there must have been a prior charge or conviction of a sexually violent offense; the antici-

pated sexually violent acts must be directed against strangers or individuals with whom relationships have been established or promoted for the primary purpose of victimization; and the person must have a congenital or acquired mental condition affecting emotional or volitional capacity sufficient to predispose the commission of such predatory sexually violent acts. Nowhere is there any requirement that this "sexually violent predator" must be "mentally ill" as defined in K.S.A. 59-2902(h), although a person subject to the Act could hardly be considered to be mentally healthy.

A "sexually violent offense" is both strictly and expansively defined as (1) rape, (2) indecent liberties with a child, (3) aggravated indecent liberties with a child, (4) criminal sodomy, (5) aggravated criminal sodomy, (6) indecent solicitation of a child, (7) aggravated indecent solicitation of a child, (8) sexual exploitation of a child, (9) aggravated sexual battery, (10) comparable federal or state crimes, (11) attempts, conspiracies, or criminal solicitations of the above crimes, and (12) "any act which either at the time of sentencing for the offense or subsequently during civil commitment proceedings pursuant to this act, has been determined beyond a reasonable doubt to have been sexually motivated." K.S.A. 59-29a02.

With this definitional background, I turn to the procedure for determining if a person is a sexually violent predator. The Act provides for written notice of anticipated release from incarceration, K.S.A. 59-29a03, the filing of a petition alleging that a person is a sexually violent predator, K.S.A. 59-29a04, and a judicial determination of whether there is probable cause to believe the person named in the petition is a sexually violent predator, K.S.A. 59-29a05.

The Act then requires the determination that a person is a sexually violent predator to be made by a court or jury. It provides for counsel to be appointed for the alleged sexually violent predator if the person is indigent, and the right to retain qualified experts or professional persons for assistance. K.S.A. 59-29a06.

The determination that a person is a sexually violent predator must be beyond a reasonable doubt by the court or by a unanimous jury, if one is requested. K.S.A. 59-29a07. (The beyond a reason-

able doubt standard is materially more stringent than the "clear and convincing" standard of proof held to be required in state involuntary commitment proceedings by Fourteenth Amendment due process. *Addington v. Texas*, 441 U.S. 418, 60 L. Ed. 2d 323, 99 S. Ct. 1804 [1979]).

If the person is determined to be a sexually violent predator, the commitment is to the Secretary of SRS "for control, care and treatment until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large." K.S.A. 59-29a07. The right of appeal is clearly stated, as is the procedure to be followed if a person charged with a sexually violent offense and found to be incompetent to stand trial is about to be released under K.S.A. 22-3305. K.S.A. 59-29a07(b).

The Act provides for yearly examinations of the person's mental condition, an annual court review, the right to petition for release, a hearing on the petition before a court or a jury, and the continued obligation of the State to show beyond a reasonable doubt that the petitioner's mental abnormality or personality disorder remains such that the petitioner is not safe to be at large and that upon discharge, he or she is likely to commit predatory acts of sexual violence. K.S.A. 59-29a10. The provisions of K.S.A. 59-29a09 specifically require that "[t]he involuntary detention or commitment of persons under this act shall conform to constitutional requirements for care and treatment."

*Factual Statement*

Although the legal issues in this case are numerous and complicated, it basically involves a factual finding by a unanimous jury that beyond a reasonable doubt Leroy Hendricks is a sexually violent predator. To place this finding in its proper perspective, a detailed recitation of the facts presented to the jury must be considered.

Hendricks testified he is 60 years old and first exhibited unlawful sexual behavior when he was 20 years old in 1955 by exposing his genitals to two young girls. He was charged with and pled guilty to indecent exposure. In 1957 he was convicted of lewdness for playing strip poker with a teenage girl.

His sexual desire for children continued. In 1960 he molested two young boys while he worked for a carnival. This resulted in imprisonment for 3 years. Soon after he was paroled in 1963, he was arrested for molesting a 7-year-old girl and again imprisoned. Attempts were made to treat him for sexual deviance, and in 1965 he was considered to be "safe to be at large" and discharged from a hospital.

Several years later, Hendricks engaged in sex with another young boy and girl. He was again imprisoned in 1967. He refused to participate in additional sexual offender treatment and remained incarcerated until he was paroled in 1972. He had been diagnosed as a pedophile; entered into and then quit treatment; and shortly thereafter began molesting his stepdaughter and stepson. He was incarcerated in 1984 for indecent liberties and was serving that sentence when he reached his conditional release date in September 1994, which resulted in these proceedings.

It is clear that Hendricks spent roughly half of his life between the ages of 20 to 60 incarcerated and had perpetrated sexual acts against children during every period when he was not in jail. He acknowledged that to relieve stress, he would molest children and that he hoped he would not do so again, but the only way to guarantee that he would not was for him to die. He acknowledged telling Dr. Charles Befort, a psychologist at Larned State Security Hospital, that "treatment was bullshit."

One of the girls Hendricks exposed himself to in 1955 testified to the incident. Hendricks' stepdaughter and stepson testified as to repeated, long-term sexual abuse during their youth.

Lester Lee, a licensed clinical social worker specializing in male sexual offender treatment, testified Hendricks had a diagnosis of personality trait disturbance, passive-aggressive personality, and pedophilia.

Dr. Charles Befort testified as to his conversations with and testing of Hendricks. Dr. Befort stated that a personality disorder is a set of characteristics or traits, causing predictable behavior, which becomes a disorder when the person behaves in an abnormal manner, causing them or society trouble. He explained that ordinarily

a mental abnormality is not a formal diagnosis but is a clinical phrase to discuss abnormality or deviance.

Dr. Befort testified he considered pedophilia to be a mental abnormality but that it was not necessarily a personality disorder. He did not diagnose Hendricks as having a personality disorder, nor did he find that he was "mentally ill" as the term is used in connection with commitments. Dr. Befort did opine, without objection, that Hendricks was a pedophile who was likely to engage in predatory acts of sexual violence or sexual activity with children if permitted.

Dr. Befort's testimony was based on Hendricks' interviews, his testing, and his activity prior to his last incarceration in 1984. He admitted on cross-examination that the term mental abnormality was not defined anywhere in the Diagnostic and Statistical Manual of Mental Disorders (3d ed. rev. 1987 and 4th ed. rev. 1995) published by the American Psychiatric Association (hereafter cited as DSM-IV), that the causes of behavior are multi-dimensional, and that "likely to" means a more than 50 percent chance that the person will engage in predatory acts of sexual violence at some point in the future. Dr. Befort reiterated on cross-examination that it was his opinion that Hendricks was a sexually violent predator as defined by the statute.

Hendricks testified briefly on his own behalf that he was divorced and had no intention of reestablishing a relationship with his former wife. Hendricks' principal witness was Dr. William S. Logan, a forensic psychiatrist, who, after qualifying outside the presence of the jury, expressed an opinion based on a reasonable degree of medical certainty that psychologists and psychiatrists are not able to predict with more than 50 percent accuracy the future dangerousness of a sex offender. He further opined that the reliability of such a prediction of dangerousness or re-offense of sex offenders would be less than 50 percent accurate.

Based on this testimony, the jury was instructed, without objection on appeal, and a unanimous finding was reached that Hendricks was a sexually violent predator.

*Substantive Due Process*

It is instructive to begin an analysis of this issue with a recitation of the rules for evaluating the constitutionality of a statute, although the importance of these presumptions becomes diminished as we weigh the ultimate balance in reaching our conclusions.

"Long-standing and well-established rules are that the constitutionality of a statute is presumed, that all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the Constitution. Moreover, it is the duty of the court to uphold the statute under attack, whenever possible, rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally sound, that should be done." *U.S.D. No. 503 v. McKinney*, 236 Kan. 224, 230, 689 P.2d 860 (1984).

In fact, the authority and duty of the court to construe a statute as constitutional if it can be done within the legislature's apparent intent is so strong that the court may read necessary judicial requirements into the statute. *State v. Durant*, 244 Kan. 522, Syl. ¶ 10, 769 P.2d 1174, *cert. denied* 492 U.S. 923 (1989).

The use of substantive due process to invalidate a statute is particularly suspect:

" 'Although the Court regularly proceeds on the assumption that the Due Process Clause has more than a procedural dimension, we must always bear in mind that the substantive content of the Clause is suggested neither by its language nor by preconstitutional history; that content is nothing more than the accumulated product of judicial interpretation of the Fifth and Fourteenth Amendments. This is . . . only to outline Mr. Justice Black's constant reminder to his colleagues that the Court has no license to invalidate legislation which it thinks merely arbitrary or unreasonable.' *Moore v. East Cleveland*, 431 U.S. 494, 543-544 (1977) (WHITE, J., dissenting)." *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225-26, 88 L. Ed. 2d 523, 106 S. Ct. 507 (1985).

The opinion of this court relies on substantive due process to declare the Act unconstitutional. However, the majority fails to address directly what test should be used to measure the constitutionality of a legislative act attacked on the basis of substantive due process. Compare *Personal Restraint of Young*, 122 Wash. 2d at 26; *State v. Post*, 197 Wis. 2d 279, 301, 541 N.W. 115 (1995). It appears to assume that if substantive due process is implicated, the

legislative act is *ipso facto* unconstitutional. Such a conclusion should not be so easily reached.

Where no fundamental right is involved, a statute attacked as violative of due process is subject to only minimal scrutiny:

"If a statute is attacked as violating due process, the test is whether the legislative means selected have real and substantial relation to the objective sought. This rule has been restated in terms of whether the statute is reasonable in relation to its subject and is adopted in the interests of the community." *Cott v. Peppermint Twist Mgt. Co.*, 253 Kan. 452, Syl. ¶ 18, 856 P.2d 906 (1993).

This standard is functionally equivalent to the rational basis test in the context of equal protection challenges. *In re Wood*, 866 F.2d 1367 (11th Cir. 1989). "Under the 'rational basis' test, if there is any rational relationship between the act and a legitimate governmental objective, the act passes muster. Under this test one challenging the constitutionality of the act bears the burden of showing no rational relationship exists between the means and the end." *State v. Risjord*, 249 Kan. 497, 501-02, 819 P.2d 638 (1991).

However, the standard is heightened where a fundamental right is involved. We held in *Farley v. Engelken*, 241 Kan. 663, 669, 740 P.2d 1058 (1987), that the "standard of scrutiny increases with the perceived importance of the right or interest involved and the sensitivity of the classification."

"The most critical level of analysis is 'strict scrutiny,' which applies in cases involving 'suspect classifications such as race, ancestry, and alienage, *and fundamental rights expressly or implicitly guaranteed by the Constitution.*' *Farley*, 241 Kan. at 669. When applying the strict scrutiny test, the burden is placed upon the State to show there is a compelling state interest in the statute, ordinance, or regulation; otherwise it is unconstitutional." (Emphasis added.) *State v. Risjord*, 249 Kan. at 501.

Thus, when considering whether a statute violates substantive due process, the first step in the analysis is to determine whether it involves a fundamental right. If it does not, a rational basis for the enactment will be sufficient to allow it to pass constitutional muster. If a statute involves a fundamental right, the statute is then subject to strict scrutiny.

This is important because of the burden-shifting nature of strict scrutiny. When the statute, ordinance, or regulation is subject to

strict scrutiny, the burden has been placed on the State to show the required compelling State interest for its action and the presumption of constitutional validity becomes greatly diminished. See *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 617, 576 P.2d 221 (1978). *But*, it does not automatically follow that the challenged statute, ordinance, or regulation is unconstitutional.

The United States Supreme Court has recently reiterated that application of strict scrutiny prescribes only the test to be applied and not the result which is to be reached. See *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237, 132 L. Ed. 2d 158, 115 S. Ct. 2097 (1995) ("[W]e wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.'"). If the government action is "narrowly tailored" to the compelling interest of the State, it survives the strict scrutiny analysis.

There is no doubt that the civil commitment of sexually violent predators involves so significant a deprivation of liberty that the protections of due process are invoked. See *Foucha v. Louisiana*, 504 U.S. 71, 80, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992); *Addington v. Texas*, 441 U.S. at 425. This clearly requires that we apply the strict scrutiny test and the analysis it involves. The question therefore becomes whether the State has shown a sufficiently compelling interest to warrant the statute's undeniable intrusion on Hendricks' liberty and whether the commitment scheme it has adopted is narrowly tailored to serve that compelling interest.

Unfortunately, the Supreme Court recently indicated in *Foucha* that our review might be somewhat less than strict scrutiny when it stated: "Freedom from physical restraint being a fundamental right, the State must have a particularly convincing reason, which it has not put forward for such discrimination against insanity acquittees who are no longer mentally ill." *Foucha*, 504 U.S. at 86. If the State were only required to have a "particularly convincing reason" for its action, it would be a less stringent test than that required by strict scrutiny. Considering the gravity of the deprivation of liberty imposed by the statute, such increased permissiveness is, in our view, inappropriate. Therefore, our analysis is based on a strict scrutiny test, beginning with the premise that the State of Kansas has a compelling interest both in treating sexually

violent predators and in protecting society from their actions. See *Vitek v. Jones*, 445 U.S. 480, 495, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (1980). The ultimate question then becomes whether the Act is sufficiently narrowly tailored to serve those interests without unduly burdening individual rights.

The majority opinion suggests that the balance has already been weighed in the United States Supreme Court in favor of Hendricks and that we are therefore bound to find the Act unconstitutional. A review of the available cases, however, illustrates that we write on a relatively clean slate on the precise issues before us, and the limited authority available suggests the Act is a legitimate exercise of the legislature's power.

*Addington v. Texas*, 441 U.S. 418, considered the question of whether procedural due process requires more than clear and convincing evidence in support of the State's burden before a person can be subject to involuntary civil commitment. The Court, in a unanimous decision, held that procedural due process required more than a mere preponderance of evidence, but not evidence beyond a reasonable doubt. The clear and convincing standard of proof was therefore adopted as the constitutional minimum for involuntary civil commitment.

*Addington* offers some guidance in the present case, but is in no sense controlling. *Addington*, as a procedural due process case, was only indirectly concerned with the substance of Texas' involuntary civil commitment laws. *Addington* did not, therefore, deal with the question of what mental condition was required to justify involuntary commitment, but only considered how certain the proof of that mental condition had to be. However, the Court considered the degree of mental pathology required in terms of evaluating the risk of error of assessment under the various standards of proof it considered.

Chief Justice Burger, in writing for a unanimous court, cautioned:

"At one time or another every person exhibits some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable. Obviously, such behavior is no basis for compelled treatment and surely none for confinement. However, there is the possible risk that a factfinder might decide

to commit an individual based solely on a few isolated instances of unusual conduct. Loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior. Increasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate commitments will be ordered." 441 U.S. at 426-27.

Thus, *Addington* tells us little more than that one may not be involuntarily committed as mentally ill without "something more serious than is demonstrated by idiosyncratic behavior." What is that "something more"? *Addington* is unequivocal: That is a question reserved largely to the states. "The essence of federalism is that states must be free to develop a variety of solutions to problems and not be forced into a common, uniform mold. As the substantive standards for civil commitment may vary from state to state, procedures must be allowed to vary so long as they meet the constitutional minimum." 441 U.S. at 431. The *Addington* Court seems to reason that the degree of proof required for involuntary commitment is inversely proportional to the severity of the ailment of the mind. See 441 U.S. at 430-33. Therefore, since our Act requires a higher degree of proof than the constitutional minimum, the Act appears to be "narrowly tailored" to restrict its application to contexts where the interests of the State are most compelling. From the dissimilar facts of *Addington*, little more guidance can be obtained.

*Jones v. United States*, 463 U.S. 354, 77 L. Ed. 2d 694, 103 S. Ct. 3043 (1983), also indirectly implies that the legislature had power to enact the Act. In *Jones*, the United States Supreme Court considered whether a determination of insanity at a criminal trial under a preponderance of the evidence standard was sufficient under the Due Process Clause to justify involuntary civil commitment without regard to the length of a hypothetical criminal sentence. Under the District of Columbia statute at issue, an insanity acquittee was to be confined in a mental hospital until he proved himself no longer mentally ill or dangerous. The Supreme Court found: "A verdict of not guilty by reason of insanity establishes two facts: (i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of mental illness."

463 U.S. at 363. It is critical to understand that in the District of Columbia a defendant's insanity is established by the *Durham* test, which excludes from punishment criminal conduct which is a product of a mental disease or defect. See *Durham v. United States,* 214 F.2d 862, 874-875 (D.D.C. 1954); *Bethea v. United States,* 365 A.2d 64, 69 n.11 (D.C. 1976). Not only did the Supreme Court find the *Durham* test sufficient to prove mental illness, it also found an insanity acquittal sufficient to support "an inference of continuing mental illness. It comports with common sense to conclude that someone whose mental illness was sufficient to lead him to commit a criminal act is likely to remain ill and in need of treatment." *Jones,* 463 U.S. at 366.

Applied here, *Jones* makes clear that a requirement that a person suffer some mental infirmity before he or she can be involuntarily committed can be satisfied by more than a single, inflexible standard. For constitutional purposes, "mental illness" is not a psychiatric diagnosis to be made in accordance with the DSM-IV, but a legal determination to be made with reference to some standard that establishes that the person suffers a condition that is an ailment of the mind, rather than mere "idiosyncratic behavior" within a range of conduct that is generally acceptable. The United States Supreme Court has clearly decided not to imbue the term "mental illness" with any specific constitutional meaning, instead showing a preference for considering the meaning applied to the term by the statutory scheme at issue. See *O'Connor v. Donaldson,* 422 U.S. 563, 574-75, 45 L. Ed. 2d 396, 95 S. Ct. 2486 (1975).

This background brings into clearer focus the exact resolve of the Supreme Court in *Foucha v. Louisiana,* 504 U.S. 71. *Foucha* is a case on which the majority places great emphasis, although it is also highly dissimilar. *Foucha* dealt with the question of whether an insanity acquittee had to remain involuntarily committed even if mentally healthy (although choosing to be anti-social), if he failed to prove he was not dangerous. It is immediately apparent that *Foucha* is unlike the present case in the very areas that made the Louisiana statute in *Foucha* most offensive. First, under our Act there is no mechanism whereby a person can be confined while mentally healthy solely on the basis of supposed dangerousness.

Second, under our Act the burden of proving an ailment of the mind and dangerousness remains always on the State, and always at the high burden of beyond a reasonable doubt.

The *Foucha* Court, without a majority opinion, found the Louisiana statute to be unconstitutional as violative of due process. The plurality opinion noted that due process required clear and convincing evidence of dangerousness and mental illness to support involuntary civil commitment. 504 U.S. at 80. Interestingly, the Court relied on *Jones*, which had determined that the mental illness required for involuntary civil commitment could be established by a finding of insanity at a criminal trial, even though Louisiana did not use the *Durham* test but rather the *M'Naghten* test. 504 U.S. at 80; La. Rev. Stat. § 14:14 (West 1986). This further illustrates that the Court recognized that "mental illness" was not a diagnostic term of art but rather a descriptive term which could be satisfied by various standards. Further evidence of the Court's flexible interpretation of mental illness is found in the fact that it alternatively referred to mental "illness," "disease," and "insanity" without expansion or qualification. 504 U.S. 81, 86. See *Jackson v. Indiana*, 406 U.S. 715, 737, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972) (recognizing involuntary civil commitment can be based on several grounds); *State v. Post*, 197 Wis. 2d at 304-05.

The plurality opinion in *Foucha* found three specific constitutional shortcomings in Louisiana's law which are not present here. First, the Court found Foucha was entitled to a determination in a civil commitment hearing of his current mental illness and dangerousness. 504 U.S. at 78. Hendricks is specifically provided with those procedural protections.

Second, after Foucha could no longer be held as an insanity acquittee, he was entitled to procedures to establish the grounds of his confinement, which were not provided. 504 U.S. at 79. There is no similar problem here.

Third, the Court held it was substantively unfair to confine a mentally healthy individual solely based on his predicted dangerousness. The State did not claim, nor did it have to prove under the Louisiana statute, that Foucha suffered any ailment of the mind. 504 U.S. at 80. In the present case, our Act requires the

State to prove a specifically defined type of mental ailment—a "mental abnormality." Hendricks' own testimony, as well as that of Dr. Befort, was admitted to support this burden.

Even if the plurality opinion in *Foucha* were applicable, it failed to garner the support of a majority of the Supreme Court as precedent for future cases. Justice O'Connor, in concurring, wrote: "I write separately, however, to emphasize that the Court's opinion addresses only the specific statutory scheme before us, which broadly permits indefinite confinement of sane insanity acquittees in psychiatric facilities. This case does not require us to pass judgment on more narrowly drawn laws . . . ." 504 U.S. at 86-87.

The majority opinion in our case rests on the erroneous conclusion that our Act is constitutionally infirm because it requires no showing of mental illness. It seems to base this conclusion on the absence of those two words. Yet it is not the incantation of "mental illness" that has constitutional significance, but the substance of the statute. Nor is mental illness an inflexible standard capable of precise meaning. As noted in *State v. Post*, 197 Wis. 2d at 304. "[T]he Supreme Court has declined to enunciate a single definition that must be used as the mental condition sufficient for involuntary mental commitments. The Court has wisely left the job of creating statutory definitions to the legislators who draft state law."

The question is not whether Hendricks fits some clinical definition of mental illness, but whether he fit a legislative classification that is more than mere idiosyncratic behavior "within a range that is generally acceptable." *Addington*, 441 U.S. at 426-27. And, whether that definition strikes an appropriate balance between a compelling interest of the State and the liberty interest of the individual—that is, whether it passes strict scrutiny.

Moreover, it is important to note that this balancing test must consider the facts of Hendricks' case and not hypothetical situations that may or may not arise under the statute. The United States Supreme Court has not recognized an "overbreadth" doctrine outside the limited context of the First Amendment. *United States v. Salerno*, 481 U.S. 739, 745, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987).

Our Act requires an ailment of the mind rising to either the level of a personality disorder or a "mental abnormality." The evidence in this case establishes that Hendricks did not have a personality disorder. The basis for commitment the State did use, that Hendricks has a mental abnormality, requires considerably more than evidence of idiosyncratic behavior which is within a range that is generally acceptable. It requires "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." K.S.A. 59-29a02(b).

Contrary to the majority opinion, this definition is not rendered meaningless by circularity. It clearly requires something more than a transitory inclination toward sexual violence generally. A person does not meet this standard for suffering from an ailment of the mind unless the person has both an ongoing mental pathology and that pathology is so severe as to prompt sexually violent *behavior*. The nature of the mental abnormality required before confinement is available is further limited by the fact that the mental abnormality must be of a type that makes the person likely to engage in a specific and limited type of sexual violence—predatory acts—in a specific setting—outside a secure facility. See K.S.A. 59-29a02(a).

While it is true that the definition of the ailment of the mind justifying the civil commitment under the Act is not identical to that justifying civil commitment of other dangerous mentally ill persons, this presents no constitutional barrier as the United States Supreme Court has not imposed a specific definition of "mental illness" for constitutional purposes. The Kansas Legislature's decision to define "mentally ill person" in one context in K.S.A. 59-2902(h) does not impose a constitutional limitation on its ability to utilize a similar concept with fundamental differences for another purpose unless it violates constitutional guarantees of equal protection, which it does not, as we will later consider.

Nor is it critical that the Kansas Legislature defined "mental abnormality" as a classification that had not been explicitly recognized by the psychiatric community. The term "mental illness" itself is not defined in the DSM-IV. The DSM-IV is not in either

design or fact a legal instrument, but merely a compendium of current thought among contemporary practitioners. The DSM-IV reflects only one perspective of the classification of mental disorders, and it violates no constitutional principle for the Kansas Legislature to select another.

"[T]here has been little agreement on which disorders should be included and the optimal method for their organization. The many nomenclatures that have been developed during the past two millennia have differed in their relative emphasis on phenomenology, etiology, and course as defining features. Some systems have included only a handful of diagnostic categories; others have included thousands. Moreover, the various systems for categorizing mental disorders have differed with respect to whether their principle objective was for use in clinical, research, or statistical settings." DSM-IV, Historical Background, p. xvi.

The DSM-IV itself acknowledges the shortcomings of its classification scheme as a mechanism to identify all mental disorders which might be relevant in different contexts. It clearly acknowledges its limitations in stating:

"Moreover, although this manual provides a classification of mental disorders, it must be admitted that no definition adequately specifies precise boundaries for the concept of 'mental disorder.' The concept of mental disorder, like many other concepts in medicine and science, lacks a consistent operational definition that covers all situations. . . . [D]ifferent situations call for different definitions." DSM-IV, Definition of Mental Disorder, p. xxi.

Thus, the fact that the legislature has chosen different definitions of mental ailments, and drawn the boundaries of what is a "mental abnormality" in accordance with its limited purposes, is not an indictment of the statutory scheme, but rather is to its credit. It reflects that the legislature has narrowly tailored its statute to include only those persons presenting the precise danger the statute seeks to abate. The DSM-IV defines classifications for purposes completely unrelated to protecting the public from sexually violent predators, and therefore it is of no moment that its classification of mental disorders differs from that adopted by the legislature.

There is no justification for linking constitutional standards to the shifting sands of academic thought reflected in the DSM-IV and its frequent revisions. "The clinical and scientific considerations involved in categorization of these conditions as mental dis-

orders may not be wholly relevant to legal judgments, for example, that take into account such issues as individual responsibility, disability determination, and competency." DSM-IV, Cautionary Statement, xxvii.

In light of the DSM-IV's purpose and design, it would be misguided to rely on it as a source of constitutional limitation on legislative power. The United States Supreme Court explained in *Jones*, 463 U.S. at 364 n.13:

"We do not agree with the suggestion that Congress' power to legislate in this area depends on the research conducted by the psychiatric community. We have recognized repeatedly the 'uncertainty of diagnosis in this field and the tentativeness of professional judgment. The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment . . . .' [Citations omitted.] The lesson we have drawn is not that government may not act in the face of this uncertainty, but rather that courts should pay particular deference to reasonable legislative judgments."

Our treatment of the insanity defense in criminal cases presents a fitting analogy. Kansas follows the *M'Naghten* test: "Under the *M'Naghten* test for criminal insanity, a defendant is to be held not criminally responsible where he does not know the nature and quality of his act or where he does not know right from wrong with respect to that act." *State v. Baker*, 249 Kan. 431, Syl. ¶ 10, 819 P.2d 1173 (1991). The DSM-IV does not contain a classification of insanity matching our legal definition. Nevertheless, we permit both lay and expert opinion on the question of criminal insanity. *State v. Harkness*, 252 Kan. 510, Syl. ¶ 11, 847 P.2d 1191 (1992).

Consequently, the substantive due process analysis reduces to this: Has the State shown a compelling interest to which its statutory scheme for involuntary commitment is narrowly tailored? As discussed above, the State interest in confining and treating sexual predators is the protection of the public from random violent sexual attack by persons known to the State to be likely to carry out such attacks. "[I]t is irrefutable that the State has a compelling interest both in treating sex predators and protecting society from their actions." *Personal Restraint of Young*, 122 Wash. 2d 1, 26, 857 P.2d 989 (1993).

Is the Sexually Violent Predator Act sufficiently narrowly tailored to achieve the State's compelling interest? I would answer this question with a ringing "yes." The Act is narrowly tailored in a number of particulars. First, it does not apply to sex offenders generally, or even to all sex offenders suffering some ailment of the mind, but applies only to those persons with an ongoing mental condition rendering them likely to commit acts of sexual violence. Second, it does not apply to those susceptible to less restrictive treatment, but only to those who require secure confinement to prevent such violence. Third, to reduce the risk of erroneous detention it does not apply to all persons accused of sexually violent offenses, but only those previously charged or convicted. Fourth, it does not apply in the face of meager, or even clear and convincing evidence, but requires the State to prove beyond a reasonable doubt that a person qualifies for confinement. Fifth, consistent with its narrowly focused goals, it requires treatment outside the Department of Corrections. Sixth, it has adequate provisions for continuing reviews to ensure that only those persons representing a continuing danger are confined and treated. These are not all the reasons but are more than sufficient to require us to uphold the constitutionality of the Act.

For all of the reasons stated, I would hold that under established substantive due process analysis, the Act is narrowly tailored to serve a compelling State interest and therefore passes constitutional muster.

Although this dissent has answered the grounds for constitutional invalidity relied on by the majority, I write further, although not in great depth, about each additional issue raised by Hendricks which I would hold to be insufficient to require the reversal of his adjudication as a sexually violent predator.

## Equal Protection

The "equal protection of the law" is guaranteed to all persons by both the Fourteenth Amendment to the United States Constitution and the Bill of Rights of the Kansas Constitution §§ 1 and 2.

Our decision on this issue is foretold by what we have said about the substantive due process issue herein. The difference between due process and equal protection is well established in *Peterson v. Garvey Elevators, Inc.,* 252 Kan. 976, Syl. ¶ 1, 850 P.2d 893 (1993), where we ·state:

"The difference between the constitutional concepts of due process and equal protection is that due process emphasizes fairness between the state and the individual dealing with the state, regardless of how other individuals in the same situation are treated, while equal protection emphasizes disparity in treatment by the state between classes of individuals whose situations arguably are indistinguishable."

Nevertheless, the test for determining the constitutionality of a statute under due process and equal protection weighs almost identical factors. *Clements v. United States Fidelity & Guaranty Co.,* 243 Kan. 124, 127, 753 P.2d 1274 (1988). When a statute is attacked as violative of equal protection, the initial inquiry becomes which standard of scrutiny to apply. I have already answered this question and explained why I would hold the Act survives strict scrutiny.

I would also hold that Hendricks' contention that similarly situated people are not treated similarly is totally without merit. All members of the class of persons of which Hendricks is a part are subject to treatment identical to that which he has received. Hendricks argues that the Act applies only to people who commit sex offenses and not other violent crimes; that the Act applies only to those who meet the definition of a sexually violent predator and not people convicted of incest; and that the Act applies a different standard of ailment of the mind to confine sexually violent predators than is used to confine other dangerous mentally ill people and subjects them to materially different procedures. None of the groups Hendricks compares to sexually violent predators are similarly situated for the limited and narrow purpose of the Act.

The legislature has broad constitutional authority to adopt statutory programs to confine and treat people who might be dangerous to themselves or others and who suffer from some mental ailment, whether a mental abnormality, a personality disorder, or mental illness as statutorily defined. However, the legislature' is

under no duty to act to the fullest extent of its authority, and the Constitution is not offended merely because the exercise of legislative power may result in some inequality. See *Clements*, 243 Kan. at 128; *Manzanares v. Bell*, 214 Kan. 589, 612, 522 P.2d 1291 (1974).

The Act focuses on the narrow problem of mental abnormality and violent, predatory sex crimes. The testimony of Senator Vancrum, previously quoted, shows the target group was "a small number of habitual sex offenders, who because of their psychological makeup, pose an immediate danger to the public."

Equal protection of the law does not require the State to choose between attacking every aspect of a public danger or not attacking any part of the danger at all. As we said in *Manzanares*:

" '[T]he legislative authority, acting within its proper field, is not bound to extend its regulations to all cases it might possibly reach. The legislature is "free to recognize degrees of harm and may confine its restrictions to those classes of cases where the need is deemed to be clearest." If "the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied." ' " *Manzanares*, 214 Kan. at 615 (quoting *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 81 L. Ed. 703, 57 S. Ct. 578 [1937]).

A statute does not violate equal protection just because it does not go as far as it might have gone. *State ex rel. Schneider v. Liggett*, 223 Kan. at 619.

The Act does not violate equal protection principles for the same reason it does not violate substantive due process—it is narrowly tailored to deal with a compelling State interest.

## Civil or Punitive Nature of Act

Hendricks appeals the trial court's finding that the Act is civil in nature and remedial, contending it is criminal and punitive. If the Act is criminal, Hendricks contends it is unconstitutional because it violates the constitutional prohibitions against double jeopardy and ex post facto laws. Since the arguments as to the second contention depend on whether the Act is civil or criminal in nature that must be first considered.

The Kansas Legislature's intention to make the Act a civil statute is clear. The preamble of the Act, which has been previously quoted in its entirety, concludes by stating: "[T]herefore a civil commitment procedure for the long-term care and treatment of the sexually violent predator is found to be necessary by the legislature." K.S.A. 59-29a01.

A person committed under the Act is placed in the custody of the Secretary of SRS, not the Department of Corrections. K.S.A. 59-29a07(a). The provisions for commitment are similar to those for involuntary civil commitment under K.S.A. 59-2901 *et seq*. The classification established by the legislature will not be ignored by the court absent the *clearest proof* that the statutory scheme is so punitive either in purpose or effect as to negate the State's intention that the proceeding be civil. *United States v. Ward*, 448 U.S. 242, 249, 65 L. Ed. 2d 742, 100 S. Ct. 2636 (1980).

The United States Supreme Court in *Ward* held that we first determine whether the legislature has applied a "civil" label to the statute and then whether the statutory scheme was so punitive either in purpose or effect as to negate that label. 448 U.S. at 248-49.

We have recently considered how a court determines whether a statutory enactment is truly remedial or punitive in character. A sanction which protects the public from harm is remedial in nature. *State v. Mertz*, 258 Kan. 745, 754, 907 P.2d 847 (1995). "Legislation which is regarded as remedial in its nature includes statutes having for their purpose the promotion of justice and the advancement of public welfare and beneficial public objects, such as the protection of health, morals, and safety of society, or of the public generally." *Mertz*, 258 Kan. 745, Syl. ¶ 9.

There is no single feature which determines whether a statute is civil or criminal. Instead the court takes a commonsense, broad view, considering several factors:

"Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be

connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions. Absent conclusive evidence of congressional intent as to the penal nature of a statute, these factors must be considered in relation to the statute on its face." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 9 L. Ed. 2d 644, 83 S. Ct. 554 (1963).

In *Allen v. Illinois*, 478 U.S. 364, 368-74, 92 L. Ed. 2d 296, 106 S. Ct. 2988 (1986), the United States Supreme Court held that the Illinois Sexually Dangerous Persons Act, which provided for the confinement and treatment of sexually dangerous persons, was civil in character such that a person subject to it could not claim the protection of the Self-Incrimination Clause of the Fifth Amendment to the United States Constitution. The Court found that by mandating care and treatment and providing for release if the person was no longer dangerous,

"the State has disavowed any interest in punishment, provided for the treatment of those it commits, and established a system under which committed persons may be released after the briefest time in confinement. The Act thus does not appear to promote either of 'the traditional aims of punishment—retribution and deterrence.' " 478 U.S. at 370.

Like the Illinois Act, the commitment under our Act for care and treatment may continue only "until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large." K.S.A. 59-29a07(a).

Hendricks argues the Act is criminal in nature because it requires a showing of scienter, which he supports by claiming the Act applies to those convicted of a sexually violent offense. See K.S.A. 59-29a01. Inconsistent with this argument is the fact the Act also applies to those *charged* with sexually violent offenses. In such cases, no finding of criminal intent would accompany civil commitment. Additionally, the United States Supreme Court rejected a similar argument in *Allen*, 478 U.S. at 370:

"[Petitioner] first notes that the State cannot file a sexually-dangerous-person petition unless it has already brought criminal charges against the person in question. . . . In addition, the State must prove that the person it seeks to commit perpetrated 'at least one act of or attempt at sexual assault or sexual molestation.' 107 Ill. 2d, at 105, 481 N. E. 2d, at 697. To petitioner, these factors serve to distinguish the Act from other civil commitments, which typically are not tied to

any criminal charge and which the petitioner apparently concedes are not 'criminal' under the Self-Incrimination Clause. . . . We disagree. That the State has chosen not to apply the Act to the larger class of mentally ill persons who might be found sexually dangerous does not somehow transform a civil proceeding into a criminal one."

The existence of previous or pending criminal convictions or charges serves only the limited purpose of identifying the group of individuals within which sexually violent predators might be found.

The testimony of individuals before the Senate and House Judiciary Committees that the Act was geared toward continued incarceration is repudiated by the stated legislative purpose, the civil nature of the commitment, and the specific requirement in K.S.A. 59-29a09 that the detention of persons "shall conform to constitutional requirements for care and treatment."

I would reject Hendricks' contention that the practical effect of the Act is indeterminate incarceration and the statement of the majority that treatment for sexually violent predators is all but nonexistent. The existence or extent of the specific care and treatment Hendricks has or will receive is not at issue here. It is clear that treatment is statutorily and constitutionally required. Further, the perspective of the committed individual is not what is relevant: "In determining if a civil proceeding has a retributive, deterrent, or remedial purpose, a court must use common sense. The court makes this determination from the objective viewpoint and not from the subjective viewpoint of the defendant." *State v. Mertz*, 258 Kan. 745, Syl. ¶ 6. The mere fact of commitment "does not itself trigger the entire range of criminal procedural protections." *Allen*, 478 U.S. at 372.

The legislature's purpose was the protection of society from those rendered sexually dangerous by a mental ailment and the treatment of such people. Together, these are permissible goals of a civil commitment scheme and do not convert the Act into a criminal statute. See *Allen*, 478 U.S. at 373. I would hold the Act to be civil in nature; thus, it should be evaluated by the standards applicable to such statutes.

*Double Jeopardy*

A claim of double jeopardy generally applies only to criminal matters, and our finding that the Act is civil in nature diminishes any basis for this claim. Irrespective of our earlier holding, the claim must fail since none of the types of constitutionally guaranteed double jeopardy protection are available to assist Hendricks. Justice Abbott explained in *Mertz*:

"The Fifth Amendment Double Jeopardy Clause of the United States Constitution states: '[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb.' The double jeopardy guaranty is enforceable against the states through the Fourteenth Amendment. *North Carolina v. Pearce*, 395 U.S. 711, 23 L. Ed. 2d 656, 89 S. Ct. 2072 (1969). Kansas also enforces an analogous double jeopardy clause in Section 10 of the Kansas Constitution Bill of Rights. It states: 'No person shall . . . be twice put in jeopardy for the same offense.' The double jeopardy protection guaranteed in the Kansas Constitution Bill of Rights is equivalent to the protection guaranteed in the United States Constitution. See *State v. Cady*, 254 Kan. 393, 396-97, 867 P.2d 270 (1994). The double jeopardy clause provides three different types of protection for a person charged with a crime. Double jeopardy protection shields an accused from '(1) a second prosecution for the same offense, after an acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense.' 254 Kan. 396 (citing *Brown v. Ohio*, 432 U.S. 161, 165, 53 L. Ed. 2d 187, 97 S. Ct. 2221 [1977])." 258 Kan. at 749.

The first type of protection has no application here because Hendricks was not acquitted of any offense. The second type of protection would apply only if the civil commitment proceeding were a prosecution for the same offenses of which Hendricks was convicted. As noted above, the Act is not concerned with Hendricks' past actions except to the extent they evidence his current dangerousness and mental ailment. Hendricks acknowledges that the second type of protection is implicated only if the Act is criminal in character rather than civil.

The third type of double jeopardy protection, relating to multiple punishments for the same offense, can be implicated even in a proceeding labeled as civil. *United States v. Halper*, 490 U.S. 435, 447-48, 104 L. Ed. 2d 487, 109 S. Ct. 1892 (1989). Thus, a civil sanction disproportionate to the harm actually caused may qualify as punishment for double jeopardy purposes. 490 U.S. at 448.

"Simply put, a civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of punishment. These goals are familiar. We have recognized in other contexts that punishment serves the twin aims of retribution and deterrence." 490 U.S. at 448-49. "[A] civil sanction is violative of the Double Jeopardy Clause only if it 'may not fairly be characterized as remedial, but only as a deterrent or retribution.' *Halper*, 490 U.S. at 448-49." *State v. Carpenter*, 197 Wis. 2d 252, 264, 541 N.W. 2d 105 (1995).

As noted above, the legislative purpose of the Act is public safety and treatment of those committed, not retribution or deterrence. Since it is remedial in nature and seeks neither punishment nor retribution, it does not constitute a double jeopardy violation.

## *Ex post facto*

Hendricks' contention that the Act is unconstitutional as an ex post facto law is without any merit.

An ex post facto law punishes as a crime an act previously committed that was innocent when done, increases the punishment for a crime after its commission, or deprives an accused of any defense which was available by law at the time the act was committed. *Collins v. Youngblood*, 497 U.S. 37, 42, 111 L. Ed. 2d 30, 110 S. Ct. 2715 (1990). Since the Act, as a civil statute, neither criminalizes conduct legal before its passage nor imposes punishment for a crime, it does not violate the Ex Post Facto Clause. Its concern is the *current* mental condition of the person subject to commitment and his or her *present* dangerousness, not any past behavior except as relevant to show current condition.

## *Procedural Due Process*

Hendricks' argument that the Act violates procedural due process must also fail. Procedural due process guarantees apply only to liberty and property interests encompassed by the Fourteenth Amendment. *Jacobs, Visconsi & Jacobs v. City of Lawrence*, 927 F.2d 1111, 1115 (10th Cir. 1991). The fundamental requirement of due process is a fair trial in a fair tribunal. *State v. Green*, 245 Kan. 398, 404, 781 P.2d 678, *cert. denied* 114 S. Ct. 1848 (1989).

The concept of due process is flexible and does not require the same kinds of procedural safeguards in all situations. *In re Marriage of Soden*, 251 Kan. 225, Syl. ¶ 6, 834 P.2d 358, *cert. denied* 121 L. Ed. 2d 540 (1992). The procedures that must be afforded an individual depend on the nature of the loss the individual faces and whether the government's interest in a more abbreviated procedure outweighs the individual's interest. *In re Cooper*, 230 Kan. 57, Syl. ¶ 3, 631 P.2d 632 (1981).

The outline of the Act at the beginning of this dissent shows Hendricks is provided with a panoply of procedural rights. "The essential elements of due process of law are notice and an opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case." *Crane v. Mitchell County U.S.D. No. 273*, 232 Kan. 51, Syl. ¶ 1, 652 P.2d 205 (1982).

The Act clearly provides all the necessary basic protections, including appointed counsel, a probable cause hearing, appointment of qualified experts or professional persons, a jury trial with unanimous decision, appeals, annual examinations, discharge petitions, hearings, and the strictest possible burden of proof on the State.

Hendricks' argument that the Act denies him the right to remain silent is meritless, as the United States Supreme Court has clearly held that the protection against self-incrimination has no application in the civil commitment of sexually violent persons. Such protections come neither from the Fifth Amendment nor the Due Process Clause. See *Allen*, 478 U.S. at 368-74.

Hendricks has failed to overcome the presumption of the constitutionality of the Act on the grounds of double jeopardy, ex post facto, and procedural due process largely because the Act is not punitive but remedial, not criminal but civil.

*Hendricks' 1984 plea agreement*

In exchange for his 1984 plea, Hendricks recounts that the State agreed to dismiss one of three counts of indecent liberties, not seek application of the Habitual Criminal Act, and recommend a prison sentence of 5 to 20 years on the remaining two counts, to be run concurrently.

Hendricks contends that he had served the required time to be released and the institution of proceedings to commit him for care and treatment violated his 1984 plea agreement.

Hendricks relies on *State v. Wills*, 244 Kan. 62, 765 P.2d 1114 (1988). In *Wills*, this court held that the State's unqualified agreement to make a specific sentencing recommendation was binding not only at the original sentencing hearing, but also at a hearing on a motion to modify the sentence.

Hendricks' argument is unpersuasive. First, Hendricks' 1984 conviction was not the basis for his involuntary commitment. His involuntary commitment was based solely on his mental ailment and present dangerousness. His 1984 conviction served only to identify him as a member of the pool of people potentially subject to the Act. Second, *Wills* stands for the limited proposition that an unqualified agreement as to the scope of *punishment* for an offense remains binding on the State after the original sentencing. Hendricks' present confinement is not punishment for any offense but merely civil commitment based on his mental condition. Civil commitment following the service of the sentence is collateral to the plea and independent of the criminal case. See *George v. Black*, 732 F.2d 108, 110-11 (8th Cir. 1984). Third, under the Act, Hendricks' conviction of, and thus his guilty plea to sexually violent offenses is immaterial. A person who is charged with such offenses is identified as within the pool to whom the Act might apply. The State did not violate the plea agreement.

*Statutory Vagueness or Overbreadth*

Hendricks' claim that the Act is violative of due process because it is too vague and overbroad in definition, in procedure, in purpose, and in application must also fail, primarily because the language of the Act, as summarized earlier, is clear.

We remain duty bound to avoid a vague construction of the Act if reasonably possible. *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, Syl. ¶ 1, 834 P.2d 368 (1992). Where the statute at issue does not impose criminal penalties, a commonsense determination of fairness is the standard for determining vagueness. See *Boatright*, 251 Kan. 240, Syl. ¶ 3. We need not again detail all the provisions of the

Act previously referred to herein to answer Hendricks' claim. The Act is comprehensive, understandable, capable of application, and sufficiently clear and definite to withstand a vagueness challenge.

*Scope of Expert Testimony*

Hendricks' argument that the trial court's limitation of his expert's testimony about a few technical details of certain academic studies amounts to reversible error is equally unconvincing.

To prevail on appeal, Hendricks must establish that the trial court abused its discretion. See *State v. Friberg*, 252 Kan. 141, 147, 843 P.2d 218 (1992). Judicial discretion is abused only where no reasonable person would take the view of the trial court. *State v. Warden*, 257 Kan. 94, 116, 891 P.2d 1074 (1995).

From a review of the record it is apparent the trial court permitted Hendricks' expert to testify about all relevant conclusions within his field of expertise. Reasonable people could agree the excluded details could confuse the jury without materially advancing Hendricks' position. Additionally, it does not appear that Hendricks attempted to offer the disputed evidence to the jury or that a proper proffer was made to preserve this issue for consideration on appeal.

Dr. Logan is an experienced psychiatrist who opined that based on numerous studies, mental health professionals erroneously predicted future unlawful behavior two out of three times and treatment has little effect on the recidivism rate for pedophiles. The evidence directly countered Dr. Befort's opinion and Hendricks' admissions, and it was up to the jury to consider its weight.

*Sufficiency of Evidence*

Because the State's burden under the Act requires proof beyond a reasonable doubt, our standard of review is whether, after viewing all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found Hendricks was a sexually violent predator beyond a reasonable doubt.

Dr. Befort's expert testimony, Hendricks' own testimony that he could not guarantee he would stop his sexual attacks on children, Hendricks' entire life history, and the testimony of three of his

victims, including two stepchildren, are clearly sufficient to support the jury's unanimous verdict.

*Conclusion*

For all of the reasons hereinbefore set forth, I dissent from this court's opinion and would hold that the Kansas Sexually Violent Predator Act is constitutional. The trial court should be affirmed.

McFARLAND, C.J., and SIX, J., join in the foregoing dissenting opinion.